Robert **LIBBY**, Plaintiff,

v.

UNITED STATES of America, Defendant and Third-Party Plaintiff,

v.

ROTH, WADKINS & WISE, INC., a Michigan Corporation, Third-Party Defendant,

and

Detroit Elevator Company, a Michigan Corporation, Third-Party Defendant,

and

Stolaruk Asphalt Paving, Inc., Third-Party Defendant.

Civ. A. No. 20218.

United States District Court
E. D. Michigan, S. D.

Sept. 24, 1962.

Menendez and LaPlata, Detroit, Mich., for plaintiff.

Lawrence Gubow, U. S. Dist. Atty., by Barton Morris, Asst. U. S. Dist. Atty., for United States defendant and third-party defendant.

Albert L. Lieberman, Detroit, Mich., for Roth, Wadkins & Wise, Inc., third-party defendant.

Lawrence Bohall of Cary, BeGole & Martin, Detroit, Mich., for Detroit Elevator Co., third-party defendant.

No appearance was filed on behalf of Stolaruk Asphalt Paving, Inc., third-party defendant.

MACHROWICZ, District Judge.

A trial of the issues in this case was had before the Court without a jury on September 18 and 19, 1962. At the conclusion of plaintiff's case the Government, defendant herein, moved for a judgment in its favor, which motion was denied without prejudice to renewal; the motion was renewed after presentation of evidence by both parties.

Upon a review of the pleadings and after hearing all of the evidence presented by the plaintiff and the Government, as well as arguments of counsel, and after a study of all the briefs submitted by counsel of record, all of which were fully considered, this Court makes the

following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. Plaintiff, a citizen of the State of Michigan and resident of Wayne County in said state, filed this action pursuant to the Federal Tort Claims Act, 28 U.S.C.A., §§ 1346(b) and 2671 et seq., for recovery of damages for personal injuries allegedly caused by defendant's employees' negligence.

2. The Government, as defendant, filed third-party complaints against Roth, Wadkins & Wise, Inc., an independent contractor engaged by the Government by contract to construct certain supporting facilities at its NIKE site located in River Rouge, Michigan, and against the Detroit Elevator Company, a subcontractor of Roth, Wadkins & Wise, Inc., and plaintiff's employer, which was engaged in making certain alterations on an elevator on the site in question, and in which work plaintiff was engaged on the day of the accident and resulting injuries alleged in the complaint.

3. Roth, Wadkins & Wise, Inc., filed a cross-action against the Detroit Elevator Company. The third-party action of the Government, defendant, against Detroit Elevator Company, third-party defendant, was dismissed before trial of this case.

4. The elevator on which the employees of the Detroit Elevator Company were doing alterations on the date in question was located in pit "A" at the NIKE site. On or about October 2, 1958 control of pit "A" was turned over to the general contractor after all missiles were removed therefrom and the pit was thoroughly cleaned by Government personnel. The general contractor assumed control of the pit under its contract with the Government during the construction operations, and work was completed on or about October 14, 1958 when the control of the premises was again assumed by the Government, after a final inspection of the work.

5. The Government maintained a military guard at the entrance to the NIKE site. It conducted "alert exercises" at other NIKE sites at which plaintiff and other employees of the Detroit Elevator Company were employed at the time of such alerts and participated therein, but no such exercises were conducted at the River Rouge site between October 6, 1958, when plaintiff began his work at the site, and the date on which the injury occurred. On about three occasions a Government employee entered the pit to see that the work proceeded according to specifications. At no time did any Government officer or employee issue any instructions or directions to any members of the Detroit Elevator Company crew, and there was no attempt whatsoever to supervise any of their work.

6. Detroit Elevator Company's employees began work at the site on October 6, 1958; the crew performing the work consisted of an elevator mechanic who was in charge of the crew and three mechanic's helpers, including plaintiff. Plaintiff had been employed by the Detroit Elevator Company in the same capacity for approximately two months; his duties consisted of carrying tools and equipment and doing general labor work. The work in which the crew was engaged on October 8, 1958 in pit "A" caused deposits of oil and grease on the floor which plaintiff traversed while doing his work and on the tools and equipment he carried, and grease and oil adhered to his hands and to the soles of his shoes or boots. While there was a slight seepage of oil, a "spot here and there", normal to the operation of a hydraulic elevator of the type involved, it was inadequate to cause the greasy and oily condition of the soles of plaintiff's shoes on the date of the accident. The only facilities available to the crew for wiping off grease and oil were "some greasy rags."

7. There were three means of entry and exit to and from pit "A":

"(a) The elevator on which the crew was making alterations which

was used as a preferred means by the crew but which was not operating on October 8, 1962 because the current was cut-off by the employees of the Detroit Elevator Company some time prior to the morning of that day;

"(b) A front hatch through which the pit could be reached by means of a steel ladder, approximately 17 feet long, with mesh steps. This ladder was permanently attached to the sides of the hatchway, about 7 inches away from the wall at the top and 21 inches from the wall at the bottom. A railing was attached to each side of the ladder, with curved ends at the top extending a few feet above the surface and continuing down the ladder and a few inches from the rungs. A lid, with handles on the outside and inside thereof, permitted closing and opening of the hatchway either from the outside or the inside of the hatchway. The crew used this hatchway whenever the elevator was not in operation and used it for descent into the pit on October 8, 1958 when they reported to work on that morning;

"(c) A rear escape hatch which was somewhat narrower than the front hatch and had a perpendicular rather than a sloped ladder. It could be opened or closed by a lid such as was used on the front hatch. Testimony offered at the trial supports an inference that this hatchway was closed throughout the period of time during which the crew was working on this occasion. The crew did not make use of this hatchway during that period."

8. The surface above the pit was part asphalt and part concrete. Dips in the surface, commonly called "bird baths", caused water to accumulate in time of rain. It rained throughout the night of October 7 and 8, and continued to rain from the time plaintiff left his home until he arrived at the work site at about 7:30, in his automobile, which he parked in water some 30 feet from the front hatchway, and remained in his automobile. His workday began at 8:00 A.M. His foreman arrived shortly before 8:00 A.M. and opened the front hatchway by removing the lid, to gain entry. Plaintiff took a direct route from his automobile to the front hatch which necessitated walking through a large pool or puddle of water some 12 to 15 feet in diameter, but he could reach the opening of the hatchway by walking around the puddle of water. When he reached the front hatchway, it was open.

9. Rain entered the hatchway while it was open and the floor of the hatchway was "damp or so-called wet", although a drain with which the pit was equipped prevented any accumulation of water therein.

10. At about 9:30 A.M. of October 8th the crew stopped for a "coffee break". The foreman supplied black coffee which he brought in a jug and plaintiff volunteered to get milk for the coffee which he had in a thermos in his automobile. Such a "coffee break" was unauthorized under the company rules of plaintiff's employer but he was given permission by his foreman to go for the milk. He ascended the ladder of the front hatch, walked again through the puddle of water between the hatchway and his automobile, carried the thermos from his automobile back to the hatchway, walking in the same puddle of water to reach it. The rain stopped sometime between 8:00 A.M. and 9:00 A.M. and it was not raining at this time, but the rungs and railings of the ladder, according to plaintiff's admission on the stand, were wet when he ascended it to get the thermos bottle. The hatchway was open when he attempted to descend into the pit again and an inference is warranted that it was left open by a member of the crew when it reported for work that morning or, if it was closed after all members reported for work, it was reopened by a crew member between that time and 9:30 A.M. when the accident occurred.

11. Plaintiff placed the thermos under his arm and his hands on the railing at each side. As he stepped on the first rung of the ladder his foot slipped and he fell to the bottom of the hatchway. As a result of this unfortunate accident he sustained the injuries complained of which included fractures of both heels and other injuries which caused, besides pain and suffering, necessity for hospitalization and medical care over an extended period of time, loss of earnings and medical expense. He is still partially incapacitated at the present time.

12. Plaintiff, who was thirty years of age at the time of the accident, served in the Navy and was familiar with ladders of the type involved here. On the witness stand he admitted as true statements he made on the taking of his deposition in January, 1961, when he said "it was nothing" for a man his age to use such a ladder. He testified on the witness stand that he was well aware of the effect of grease and oil on his hands and soles of his shoes on a wet steel surface. He knew that his hands and the soles of his shoes were greasy; he knew that the steel rungs and railings of the ladder were wet; and he admitted that the thermos bottle under his arm somewhat restricted free action on his part. He did not examine the rear hatchway to determine whether it was dry and made no attempt to descend by means of that hatchway. He admits that the accident was caused by the slipping of his foot off the first rung of the ladder when he was about to descend by means thereof. In attempting to descend the ladder under these conditions plaintiff failed to exercise such care for his own safety as would be exercised by a reasonably prudent person under like or similar circumstances.

13. The defendant did not have timely knowledge of the combination of circumstances existing at the entrance to the front hatchway; furthermore, such condition was obvious and clearly apparent to anyone using the hatchway at that time, including the plaintiff.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and the subject-matter of this suit.

2. In order to hold the defendant, United States of America, liable for plaintiff's injuries under the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346 (b) and 2671 et seq., plaintiff is required to prove some act of misfeasance or nonfeasance of a Government employee acting within the scope of his office or employment under such circumstances that the United States, if a private citizen, would be liable under Michigan law.

3. Under the facts as found by the Court the defendant did not exercise such control of the portion premises on which the accident occurred as to hold it liable for any negligence as alleged by plaintiff since any negligence in that respect would be chargeable to the independent contractor and his sub-contractor. The independent contractor assumed responsibility of direct supervision over the work then being performed and for the manner in which the operations were carried out.

4. The Government owed no duty to warn plaintiff of any hazards of which it did not have timely notice but which were well known to plaintiff.

5. Plaintiff failed to sustain the burden under the Federal Tort Claims Act "of establishing" negligence on the part of defendant.

6. The proximate cause of the accident which caused plaintiff's injuries was his own failure to exercise reasonable care for his own safety at the time and place in question, and such failure amounted to negligence on his part which would bar any claim for recovery of damages for his injuries. Defendant is, therefore, entitled to a judgment in its favor.

7. In view of this ruling it is unnecessary for the Court to consider issues raised in pleadings of the remaining parties to this suit.

A judgment in favor of the defendant will be entered, accordingly.